# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHALOMYAH BOWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2026-0006-DH |
| BLACK LIVES MATTER GLOBAL | ) | |
| NETWORK FOUNDATION, INC., a | ) | |
| Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPORT

Report: July 13, 2026
Date Submitted: April 20, 2026

Rebecca L. Butcher, Jennifer L. Cree, Cheol W. Park, LANDIS RATH & COBB LLP, Wilmington, Delaware; Barak Cohen, Michael J. Wadden, Shelby Rampolo, PERKINS COIE, LLP, Washington, D.C.; *Attorneys for Plaintiff Shalomyah Bowers*.

Oderah C. Nwaeze, Angela Lam, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Beth I. Z. Boland, Byron J. McLain, Alexis M. Jackson, FOLEY & LARDNER LLP, Boston Massachusetts; *Attorneys for Defendant Black Lives Matter Global Network Foundation, Inc*.

**HUME, IV, M.**

Not for the first time, the parties ask the Court to decipher laconic subpoenas to determine whether Plaintiff is entitled to advancement. Plaintiff was an employee, officer, director, and multifaceted agent for Black Lives Matter Global Network Foundation, a corporation affiliated with the broader Black Lives Matter movement. Plaintiff served in de facto and de jure roles, both within the organization and, most profitably, through a contracting agreement with his closely held LLC. The Corporation's high-profile political activities garnered scrutiny, first from political dissidents and ultimately the law-enforcement arm of the federal government. A slew of critical reportage ensued, soon followed by DOJ investigatory subpoenas.

Defendant corporation contends that the subpoenas focus on activities that either (1) predate Plaintiff's role as director and officer or (2) relate to Plaintiff's role as consultant. Recognizing that threadbare subpoenas permit limited certainty, I hold that Plaintiff has met his burden in showing a nexus between his capacity as director, officer, and agent of the corporation and the DOJ's investigation. Accordingly, Plaintiff is entitled to advancement.

## I. BACKGROUND[1]

In October 2017, Patrisse Cullors, one of three core founders of the Black Lives Matter movement, incorporated the entity now known as BLM-GNF.[2] Cullors intended for the organization to receive donations on behalf of the BLM movement.[3] BLM-GNF initially retained a small staff and board.[4]

In 2020, after the murder of George Floyd and subsequent protests, donor interest in BLM-GNF surged, and Cullors determined that the entity needed greater management support to sustain its operations.[5] Prior to 2020, Bowers performed some unpaid work for BLM-GNF.[6] In July 2020, Bowers started his role both as

---

[1] Unless otherwise noted, pleadings are cited by reference to items docketed in C.A. No. 2026-0006-DH ("D.I."). Citations are to: Verified Complaint of Shalomyah Bowers against Black Lives Matter Global Network Foundation, D.I. 1 ("Compl."); Plaintiff's Brief in Support of Plaintiff's Cross-Motion for Summary Judgment on Entitlement, D.I. 25 ("POB"); Defendant Black Lives Matter Global Network Foundation, Inc.'s Brief in Support of Its Motion for Summary Judgment, D.I. 27 ("DOB"); Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, D.I. 37 ("PAB"); Defendant Black Lives Matter Global Network Foundation, Inc.'s Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment, D.I. 38 ("DAB"); and Transcript of the Parties' Arguments Regarding Cross-Motions for Summary Judgment, D.I. 47 ("Trans.").

[2] Cree Aff., D.I. 25, Ex. A, ¶ 18.

[3] *See id.*, ¶¶ 21–22 (noting the IRS's acknowledgment of BLM-GNF's 501(c)(3) status).

[4] Cree Aff., Ex. B (Deposition of Shalomyah Bowers), 46:12–19.

[5] POB, 4; *see* Cree Aff., Ex. B, 195:16–24 ("[Cullors] was on the road a lot. She did not have the bandwidth nor capacity to be in the day-to-day of BLMGNF, which is what she delegated to me.").

[6] Cree Aff., Ex. B, 64:3–8.

Deputy Executive Director to Cullors and Strategist for BLM-GNF.[7] Approximately one year later, Bowers was appointed as a BLM-GNF board member.[8]

BLM-GNF's bylaws contained indemnification and advancement provisions, which provide in relevant part:

> The Corporation shall indemnify each director, officer, employee and agent of the Corporation who is a natural person . . . by reason of the fact that they are or were serving as a director, officer, employee or agent of the Corporation, to the fullest extent permitted by the General Corporation Law of the State of Delaware, (i) against all expenses (including attorneys' and other experts' fees and disbursement), judgments, fines and amounts paid in settlement actually and reasonably incurred by them in connection with any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative, or in connection with any appeal therein, or otherwise, arising from, or in connection with, their serving the Corporation.[9]

In addition to the provision that indemnified parties are entitled to indemnification to the fullest extent guaranteed under Delaware law, the bylaws expressly provided for advancement.

> [The] right to indemnification conferred in these Bylaws shall include the right to be paid by the Corporation the expenses incurred in defending any proceeding for which such right to indemnification is applicable in advance of its final disposition (an "Advancement of Expenses")[.][10]

---

[7] Cree Aff., Ex. A, ¶ 35.

[8] *Id.*

[9] Compl., Ex. 1, § 7.1(a).

[10] *Id.*, § 7.1(d).

4

The bylaws also specified that the right to indemnification and advancement "shall not be deemed to be exclusive of any other rights to which persons seeking indemnification or advancement of expenses may be entitled under any agreement . . . ."[11]

Bowers wore numerous "hats" throughout his service for BLM-GNF.[12] In July 2021, Bowers joined BLM-GNF as a director and corporate secretary.[13] One year prior, in 2020, BLM-GNF executed a Consulting Services Agreement ("CSA" or "Services Agreement") with BOWERS*, a consulting firm wholly owned by Bowers. The Services Agreement enumerates the duties that BOWERS* would perform on BLM-GNF's behalf.

> Consultant hereby agrees to perform, at Client's request, the following services . . . on a non-exclusive basis during the terms of this Agreement: (a) General consulting services, including but not limited to strategy, design, communications, data, digital, political, training, message development, copywriting, executive coaching and support, tv and digi[t]al production support, campaign management, project management, staff management.[14]

---

[11] *Id.*, § 7.3.

[12] *See* Trans. 24:13–16 ("But I want to orient the Court and the discussion around three concepts: Number one, the role that Mr. Bowers was, in fact, playing during the course of his various different hats with BLM-GNF"); *Id.* 24:20–21 ("Mr. Bowers had several hats. He wore several hats, as we know.").

[13] *See* Cree Aff., Ex. A, ¶ 35; Compl. ¶ 3.

[14] Cree Aff., Ex. C, § 1(a).

Section 8 of the Services Agreement recognized that Bowers "is also an employee of [BLM-GNF] per a separate agreement."[15]   The services agreement further contained an indemnification clause.

> [BLM-GNF] agrees to indemnify and hold harmless Consultant and Consultant's directors, officers, representatives, agents and employees against any and all losses, liabilities, damages, demands, settlements, judgments, costs and [expenses] including reasonable attorneys' fees, sustained as a result of, or arising in connection with (a) any claim or action arising from or in connection with Client's approval of all press and/or promotion activities described in Section 4 above performed in connection with this Agreement . . . .[16]

### A. Bowers's Powers and Responsibilities Regarding BLM-GNF

Bowers acted as BLM-GNF's agent even before commencing his Deputy Executive Director role.[17]  By June 2020, Cullors had specifically authorized Bowers to enter into contracts on the organization's behalf.[18]  Also in 2020, BLM-GNF appointed Bowers as its Deputy Executive Director.[19]  As Deputy Executive

---

[15] *Id.*, § 8.

[16] *Id.*, § 7(a).  Section 4 of the Services Agreement states, "Coordination.  Consultant shall coordinate all Services with Client."  *Id.*  Services refers to Section 1(a), described above.

[17] *See* Compl., ¶ 12.

[18] Cree Aff., Ex. B, 98:1–99:4; *see id.*, Ex. C at 18 ("Prior to May 2021, in connection with BLMGNF, Shalomyah Bowers served in roles including but not limited to Deputy Executive Director of BLMGNF (for signing purposes), . . . agent, administrative support, general consulting . . . .").

[19] Cree Aff. Ex. A, ¶ 35 ("Shalomyah Bowers . . . commenced his role as Deputy Executive Director to Cullors and Strategist for BLM GNF in July 2020.").

Director, Bowers oversaw several of BLM-GNF's consultants.[20] Bowers also assumed primary responsibility as the point person for several of BLM-GNF's funds.[21] Bowers represented himself to the public as BLM-GNF's agent beyond the scope of the Consulting Services Agreement.[22] Most notably, Bowers signed BLM-GNF's IRS Form 990 for the 2020 Fiscal Year as "Shalomyah Bowers, Board Secretary," in the box entitled "Signature of officer."[23]

While working for BLM-GNF, Bowers never received a salary as BLM-GNF's employee.[24] Instead, Bowers received all payments via the Services Agreement.[25] The 2020 Services Agreement paid BOWERS* $140,000 per month.[26] On July 10, 2022, the parties amended the 2020 Services Agreement and

---

[20] Trans. 195:1–24.

[21] Cree Aff., Ex. A, ¶¶ 35–36.

[22] *See, e.g.*, *id.* at ¶ 41 (describing Bowers overseeing the disposition of certain funds within BLM-GNF's control before signing the Services Agreement).

[23] Cree Aff., Ex. F (Signed IRS Form 990). Bowers signed the form on May 13, 2022. *Id.*

[24] The majority of BLM-GNF's employees did not receive a salary. *See* Cree Aff., Ex. O (BLM-GNF's 2021 Form 990 showing only one paid employee, Paul Cullors).

[25] Trans. 27:06–14 ("[Bowers] chose that he wanted all of his work to go through Bowers Consulting. Maybe he did it for tax reasons; maybe he did it because he liked that layer in between . . . for liability purposes; or maybe he did it because he got paid a ton of money through Bowers Consulting . . . ."); *see* Lam Aff., Ex. E (deposition testimony of Bowers stating he never received compensation outside the BOWERS* services agreements).

[26] Lam Aff., D.I. 29, Ex. A.

paid BOWERS* $69,780 for additional services.[27] The 2023 Services Agreement amended BOWERS*'s monthly rate to $130,000.[28]

### B. News Reports Cover Accusations Regarding Alleged Misconduct at BLM-GNF.

In early 2022, a wave of news reports covered BLM-GNF activities, alleging a multiplicity of misconduct claims. For example, the *Washington Examiner*,[29] *New York Post*,[30] and *New York Magazine Intelligencer*[31] published reports concerning financial improprieties, such as (1) the purchase and use of a Los Angeles Property in 2020, (2) misstatements on an IRS Form 990 signed by Bowers, and (3) violations of IRS rules in soliciting donations on behalf of BLM PAC.[32] Following the news reports, the National Legal and Policy Center filed an IRS complaint concerning these activities and urged the IRS to "conduct a full investigation and audit of

---

[27] Lam Aff., Ex. C.

[28] Lam Aff., Ex. D.

[29] *See, e.g.*, Andrew Kerr, *BLM purchased $6 million Los Angeles mansion with donor money: Report*, Washington Examiner (Apr. 4, 2022), https://www.washingtonexaminer.com/news/blmpurchased-6-million-los-angeles-mansion-with-donor-money-report.

[30] *See, e.g.*, Isabel Vincent, *Inside the $6M mansion BLM reportedly bought with donated funds*, New York Post (Apr. 6, 2022), https://nypost.com/2022/04/06/blms-patrisse-cullors-slams-racist-report-on-6m-socal-mansion/.

[31] *See, e.g.*, Sean Campbell, *Black Lives Matter Secretly Bought a $6 Million House Allies and critics alike have questioned where the organization's money has gone*, New York Magazine (Apr. 4, 2022), https://nymag.com/intelligencer/2022/04/black-lives-matter-6-million-dollar-house.html.

[32] *See* POB, 8–9; Cree Aff., Ex. G.

BLMGNF's finances and transactions immediately, including examining the minutes of all Board meetings, thoroughly reviewing their 990-tax return to be filed next month, assessing appropriate civil and criminal penalties, and revoking their tax exempt status if warranted."[33]

Soon thereafter, the *Washington Examiner* published further reporting about payments from BLM-GNF to an employee, a contractor, and BOWERS*.[34]

## C. DOJ Launches an Investigation and Subpoenas Bowers and BOWERS*.

In or about September 2025, the United States Department of Justice ("DOJ") launched an investigation into BLM-GNF and its leadership. The following month, the DOJ served federal grand jury subpoenas on both Bowers and BOWERS*, with 21 materially identical requests on both forms.[35] The subpoenas requested internal documents for BOWERS*,[36] records regarding retreats arranged by BLM-GNF staff including Cullors,[37] records regarding loans and financial transactions between

---

[33] Cree Aff., Ex. G, 9.

[34] *See, e.g.*, Andrew Kerr, *BLM doled out millions to Patrisse Cullors's family and friends, IRS filing shows*, Washington Examiner (May 17, 2022), https://www.washingtonexaminer.com/news/1244225/blm-doled-out-millions-to-patrisse-cullorss-family-and-friends-irs-filing-shows/.

[35] Compl., ¶¶ 14–16; Compl., Exs. 2–3.

[36] Compl., Ex. 2 (bullet points one through five).

[37] *Id.* (bullet point 9, subparts a through c).

Bowers or BOWERS* and BLM-GNF,[38] and numerous communications. Eight of the materials specifically mentioned BLM-GNF, and seven solely pertained to BOWERS*'s internal entity records. The subpoenas list six individuals by name: Bowers, Patrisse Cullors, Damon Turner, Paul Cullors, Dyane Pascall, and Mervyn Marcano. All such individuals are "current or former directors, employees, consultants, and/or grant recipients of BLM-GNF."[39]

Notably, the Bowers subpoena advises that Bowers is "a subject of the Grand Jury's investigation," and identifies two relevant federal statutes: "18 U.S.C. § 1519 (false statement to a federal agency) and 18 U.S.C. § 1343 (wire fraud)." The subpoena to BOWERS* omitted any information about being the suspect of a criminal investigation and the relevant criminal statutes.[40]

Also in September 2025, the DOJ subpoenaed BLM-GNF "related to work performed by BOWERS* consulting.[41] Four months later, the office of the United States Attorney for the Central District of California sent a letter to BLM-GNF informing it of its investigation into "possible false statements on the Internal Revenue Service Form 990 for [BLM-GNF] for the years 2020 and 2021, as well as

---

[38] *Id.* (bullet points six through eight, ten and eleven).

[39] POB, 14.

[40] *See* Compl., Ex. 3.

[41] Gay Aff., D.I. 29, ¶ 6. The parties did not include the BLM-GNF subpoena in the stipulated record.

wire fraud and embezzlement from BLM GNF . . . ."[42]  The letter further stated that the U.S. Attorney's Office "does not currently view BLM GNF as a target in the Investigation, but rather currently views BLM GNF as a potential witness."[43]

### D. Bowers retains Counsel.  BLM-GNF terminates its relationship with Bowers and BOWERS*, then denies his advancement request.

Following receipt of the subpoenas, Bowers retained counsel.[44]  The same counsel jointly represented Bowers and BOWERS* given the DOJ's materially identical demands.[45]

In September 2025, the same month the DOJ issued the subpoenas, the BLM-GNF board of directors issued a resolution discharging Bowers from his duties with BLM-GNF.[46]  BLM-GNF also terminated its consulting relationship with BOWERS*.[47]

Two months later, Bowers requested advancement for legal expenses related to the pending criminal investigation by the U.S. Attorney and ongoing civil litigation with the Tides foundation.[48]  Bowers asserted BLM-GNF's bylaws and the

---

[42] Lam Aff., Ex. G.

[43] *Id.*

[44] Compl. ¶ 17.

[45] DOB, 14.

[46] Compl. ¶ 11.

[47] Cree Aff. Ex. M.

[48] Compl. Ex. 4, 1–2.

Consulting Services Agreement as his basis for entitlement to advancement.[49] Receiving no response from BLM-GNF, Bowers submitted his second request in December 2025.[50] Six days later, Bowers informed BLM-GNF that he would file suit should BLM-GNF fail to furnish advancement.[51] The next day, BLM-GNF responded and denied advancement.[52]

BLM-GNF denied advancement by asserting that Bowers failed to satisfy the "nexus or casual connection test" required for advancement under BLM-GNF's bylaws (and under the DGCL). It argued, as it does here, that the DOJ "sought records regarding transactions and activities that pre-date Mr. Bowers' service as a director of BLM GNF."[53] While conceding that the DOJ "sought evidence during the time that Mr. Bowers also served as a director of BLM GNF," the DOJ appears to target "evidence of Mr. Bowers' conduct in his BOWERS* capacity."[54] BLM-GNF did admit that it is "entirely possible that the government' approach here *may be to develop evidence that Mr. Bowers defrauded BLM GNF."[55] BLM-GNF also

---

[49] *Id.* at 1.

[50] Compl., Ex. 5.

[51] Compl. ¶ 24; Answer ¶ 11.

[52] Compl., Ex. 6.

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.* at 2–3 (emphasis added).

rebutted Bowers's request for advancement under the consulting agreement for failure to comply with the Agreement's notice requirement.[56]

Bowers's counsel submitted a final letter in December 2025 requesting advancement.[57] This letter sought advancement only for expenses incurred in connection with the DOJ investigation under the BLM-GNF bylaws' advancement provisions.[58] The letter conceded that while the subpoenas did request some information that predated Bowers's service on BLM-GNF's board, Bowers was BLM-GNF's agent during the time-period in question and the bylaws guarantee advancement to any individual "officer, employee, or *agent* of the Corporation[.]"[59]

### E. Procedural History

On January 2, 2026, Bowers filed suit to procure advancement.[60] After BLM-GNF entered its appearance in the case, the parties jointly stipulated for a final decision by a Magistrate in Chancery under 10 *Del. C.* § 350 and Court of Chancery

---

[56] *Id.* at 3.

[57] Compl., Ex. 7.

[58] *Id.* at 1 n.1.

[59] *Id.* at 2 (emphasis in original).

[60] D.I. 1.

Rule 144(g).[61]  The parties cross-moved for summary judgment,[62] and I heard argument on the motions on April 20, 2026.[63]

## II.  ANALYSIS

The parties have made cross-motions for summary judgment.  Although the Court normally views the facts "in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact," cross-motions obviate the need to draw inferences in favor of either party.  *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Hldg. Co.,* LLC, 853 A.2d 124, 126 (Del. Ch. 2004); *see* Ct. Ch. R. 56(c).  Instead, "[w]here the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."  Ct. Ch. R. 56(h).

Because the parties have cross-moved for Summary Judgment, they have essentially stipulated to a final decision on the record before me.  On this record,

---

[61] D.I. 11, 12.

[62] D.I. 25, 26.

[63] D.I. 46.

Bowers is entitled to advancement for expenses incurred arising from the DOJ Investigation.

### A. Bowers is entitled to advancement under BLM-GNF's bylaws because the DOJ Investigation arises out of his conduct as a Director and Officer.

Much has been made of the respective parties' burdens in adjudicating advancement.[64] Undoubtedly, Bowers bears the burden of proving his entitlement to advancement. Because BLM-GNF's bylaws guarantee advancement for litigation expenses incurred "by reason of the fact that the person is or was a director, officer, employee, or agent of the corporation," the sole question is whether Bowers's litigation expenses bear a "causal connection or nexus" with his "corporation function or official corporate capacity" with BLM-GNF.[65]

Neither party contests that Bowers served as a director or officer of BLM-GNF. Instead, the parties have distilled the questions as follows: (1) whether the DOJ is investigating Bowers in connection with his role as director or instead for his role as agent through the BOWERS* Services Agreement; and (2) whether the

---

[64] *See, e.g.*, Trans. 52:03–09 ("So the Court in that case actually put the burden back on the plaintiff and said you need to give proof how the actions that you are taking derived solely from your capacity as this indemnified person. And that's what we would ask here. They have the burden to show that -- you know, DOJ is looking at a lot of things. We have given you the roadmap about where they're looking at and which parts are clearly off the table").

[65] *See* POB, 20; DOB, 12.

Consulting Agreement modify the bylaws' advancement right as it pertains to Bowers as agent.

And while the burden rests on Bowers to demonstrate entitlement, BLM-GNF attempts to parse too finely the degree to which Bowers must make the showing. I am cognizant of the part advancement plays in the greater symphony of indemnification as provided for under 8 *Del. C.* § 145. If Bowers can sufficiently prove a causal connection or nexus between the DOJ Investigation and his role as officer, then he is entitled to advancement. Line-item disputes belong in the *Fitracks* process, and broader questions of scope may be addressed at indemnification. *Danenberg v. Fitracks*, 58 A.3d 991 (Del. Ch. 2012). After all, "In advancement cases, the line between being sued in one's personal capacity and one's corporate capacity generally is drawn in favor of favor of advancement with disputes as to the ultimate entitlement to retain the advanced funds being resolved later at the indemnification stage." *Davis v. EMSI Hldg. Co.*, 2017 WL 1732386, at \*10 n.47 (Del. Ch. May 3, 2017).

### 1. BLM-GNF's Bylaws guarantee advancement for Directors and Officers.

It is undisputed that BLM-GNF's bylaws provide mandatory advancement and indemnification for directors and officers. "Where a bylaw clearly creates a right to mandatory advancement, the right is enforceable upon satisfaction of the prerequisites . . . ." *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316,

16

at *13 (Del. Ch. May 30, 2008) (citing *Gentile v. SinglePoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001)). Moreover, where bylaws provide for mandatory advancement, "This Court construes mandatory advancement provisions broadly in order to effectuate Delaware's policy of quickly providing temporary relief from substantial litigation expenses." *Thompson v. Orix USA Corp.*, 2016 WL 3226933, at *2 (Del. Ch. June 3, 2016). Therefore, I begin with a discussion of BLM-GNF's bylaws.

Under Section 7.1(a) of the Bylaws, a right to indemnification arises for each director, officer employee, and agent who is a natural person . . . by reason of the fact that they are or were serving as a director, officer, employee or agent of the Corporation, to the fullest extent permitted by the General Corporation Law of the State of Delaware, (i) against all expenses . . . judgments, fines and amounts paid in settlement actually and reasonably incurred by them in connection with any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative . . . arising from, or in connection with, their serving the Corporation.

Additionally, Section 7.1(d) of the Bylaws includes "the right to be paid by the Corporation the expenses incurred in defending any proceeding for which such a right to indemnification is applicable in advance of its final disposition . . . ." Therefore, the analysis must proceed as follows. First, I determine whether the DOJ's investigation is a covered proceeding under Section 7.1(a). Second, I decide

17

whether the investigation arises "by reason of the fact" Bowers was a "director, officer, employee, [or] agent." Third and finally, I ascertain whether Bowers's expenses were "actually and reasonably incurred" in connection with such covered proceeding.

### a. The DOJ Investigation is a Covered Proceeding.

Neither party materially disputes whether a DOJ Investigation is a Covered Proceeding. Bowers contends in his briefing that "The DOJ Investigation plainly qualifies as both an actual investigative action and a threatened criminal action, and BLM-GNF does not dispute that the DOJ Investigation is the type of proceeding for which the Bylaws provide mandatory indemnification and advancement."[66] BLM-GNF, for its part, does not contest that the DOJ investigation is the type of proceeding covered by the Bylaws' advancement provision.[67] Instead, BLM-GNF counters that (1) the DOJ Investigation focuses on conduct performed by BOWERS* as an agent, rather than Bowers as a director and officer, and (2) the DOJ investigated conduct "focused on events prior to [Bowers's] conduct prior to his appointment to the BLM GNF Board."[68]

---

[66] POB, 19.

[67] *See* DOB, 18–19.

[68] *Id.*

I address BLM-GNF's contentions in the following section, but there is no doubt that Bowers has satisfied the first prong of my inquiry regarding the covered status of the DOJ Investigation.

### b. Bowers incurred advanceable costs in part by reason of the fact he was a Director and Officer of BLM-GNF.

The mandatory advancement provision of the bylaws is coextensive with the scope of advancement provided for in 8 *Del. C.* § 145(e). While "the advancement authority conferred by section 145(e) is permissive," BLM-GNF voluntarily provided for mandatory advancement to the fullest extent permitted by the DGCL. *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005). And "[w]hen a corporation agrees to make mandatory the permissive authority to provide advancement and indemnification conferred by Sections 145(a), (b) and (e) of the General Corporation Law, the corporation confers a contractual fee-shifting right on the covered person." Both the Bylaws and Section 145 require that advancement expenses be incurred "by reason of the fact" that the covered party was a director or officer of the entity.

Under Delaware law, the "by reason of the fact" standard is construed "broadly and in favor of indemnification and advancement." *Pontone v. Milso Industries Corp.*, 100 A.3d 1023, 1051 (Del. Ch. 2014). The essential test is whether there is a "nexus or causal connection between any of the underlying proceedings . . . and one's official corporate capacity." *Homestore, Inc.*, 888 A.2d at 214. Insofar

19

as the "corporate powers were used or necessary for the commission of the alleged misconduct," the "by reason of the fact" standard is satisfied. *Bernstein v. TractManager, Inc.*, 953 A.2d 1003, 1011 (Del. Ch. 2007).

When the corporation's charter or bylaws provide for mandatory advancement, "the company carries the ultimate burden of proving that advancement is not required." *Krauss v. 180 Life Scis. Corp.*, 2022 WL 665323, at *4 (Del. Ch. Mar. 7, 2022). Consequently, where the plaintiff has demonstrated some entitlement to advancement, yet the precise scope of advancement is ambiguous, prudential concerns counsel in favor of granting entitlement to advancement and "deferring resolution of less clear-cut disputes to the indemnification stage" to avoid excessive litigation. *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at (8 (Del. Ch. May 28, 2015).[69]

The dispositive question here is whether the DOJ Investigation and Bowers's legal expenses incurred as a result bear a nexus or causal connection to Bowers's

---

[69] *Mooney* acknowledges where the answer to entitlement "can be discerned swiftly, accurately, and consistent with the summary nature of an advancement proceeding," then it is appropriate for the Court to resolve disputes over the scope of entitlement to advancement. 2015 WL 3413272, at *8. I understand *Mooney* to counsel the Court to grant entitlement to advancement where the capacious "by reason of the fact" standard is met yet the parties dispute factually-laden questions of scope. Both the *Fitracks* process and the indemnification stage are better equipped to resolve such questions. *Mooney* does not counsel carte blanche entitlement where entitlement would not otherwise be appropriate. *See Mooney*, 2015 WL 3413272, at *4 (denying entitlement to advancement for a FINRA investigation where advance was not a party to the investigation).

official duties as a director and officer of BLM-GNF. The DOJ Subpoenas offer the most probative evidence of what the DOJ investigated and therefore whether the investigation arose by reason of the fact of Bowers's status as a director and officer.

While I analyze them below, the DOJ Subpoenas provide limited grounds to perform a comprehensive exegesis of the Government's intentions and aims in conducting the investigation. Even so, BLM-GNF cannot succeed in rebutting Bowers's arguments that the investigation arises at least in part by virtue of his position as a director and officer of BLM-GNF. And, as this Court has recognized on many prior occasions, where uncertainty arises regarding apportionment between covered and non-covered claims—i.e., investigations into Bowers as director and officer versus investigations of BOWERS* as agent—the Court should determine entitlement and delay apportionment until the *Fitracks* process or even indemnification stage. *See, e.g., Krauss*, 2022 WL 665323, at *5 (granting entitlement to advancement arising out of an SEC investigative subpoena and deferring apportionment to a later stage).

Bowers relies on several reasonable inferences from the language of the subpoenas. First, Bowers argues that the subpoenas' demand for information regarding BLM-GNF's payments to BOWERS* indicates that Bowers abused his position as director, officer, and agent of BLM-GNF to unjustly enrich both himself

21

and BOWERS* with donor money.[70]    Second, Bowers argues that the DOJ's investigation of possible violation of 18 U.S.C. § 1519 relates to Bowers's signature on BLM-GNF's Form 990, which was signed in Bowers's role as a director of BLM-GNF.  Third, the DOJ subpoena requests copies of donor statements, which Bowers contends he made or maintained under his role as Secretary of BLM-GNF.  Fourth, the DOJ subpoena is focused on activities that occurred during Bowers's tenure as a director and officer of BLM-GNF.

### i.        Unjust Enrichment and Embezzlement

First, Bowers argues that the subpoenas' demand for information regarding BLM-GNF's payments to BOWERS* indicates that Bowers abused his position as director, officer, and agent of BLM-GNF to unjustly enrich both himself and BOWERS* with donor money.[71]  BLM-GNF counters by arguing the alleged fraud and embezzlement related to BOWERS*, not Bowers, as shown by the subpoenas' overwhelming interest in on "documents created or maintained by BOWERS* Consulting, rather than by Mr. Bowers himself."[72]  Because my inquiry is focused on entitlement, not minute questions of scope, Bowers's argument is the more prevailing.

---

[70] *See* POB, 21.

[71] *See* POB, 21.

[72] DAB, 16.

Deciphering the DOJ's investigatory intent on the basis of two concise and identical subpoenas constitutes a near-Sisyphean task. BLM-GNF places substantial weight on the subpoenas' greater focus on documents within the control and possession of BOWERS* to infer that the BOWERS* agency relationship, not Bowers's director relationship, is the more relevant to the investigation. And the argument is not without merit. The requested records primarily pertain to BOWERS*, and the few records specifically focused on BLM-GNF relate to activities in 2020 and 2021, before Bowers assumed his officer position.[73]

But requested documents alone do not circumscribe the probable scope of the DOJ's investigation. The subpoenas identified wire fraud and embezzlement theories of potential criminal liability, again confirmed in the U.S. Attorney's letter to BLM-GNF. The theories of wire fraud and embezzlement support an inference that the DOJ is investigating whether Bowers used his "corporate authority to enrich [himself] by wrongfully directing donor funds to entities" he controlled.[74]

Bowers helpfully homes in on the nature of "embezzlement."[75] It is black-letter law that a distinguishing feature of embezzlement (versus larceny) is that "the property must already be in the embezzler's lawful possession when he

---

[73] *See* DOB, 8–9.

[74] PAB, 8.

[75] *Id.* at 9.

misappropriates it." 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIM. L. § 19.6(e) (3d ed. 2025); *see, e.g.*, 18 U.S.C. § 641 (embezzlement of public money, property or records). And this Court has recognized in an advancement action that a director's embezzlement of the corporation could not have occurred but for his status as a director or officer. *Perconti v. Thornton Oil Corp.*, 2002 WL 982149, at *6 (Del. Ch. May 3, 2002) ("Similarly, it was [advancee's] status as officer that enabled him to embezzle . . . or to transfer the corporate funds for his benefit.").

Moreover, Bowers has already defended himself in a civil lawsuit accusing him of abusing his director authority in connection with improper payments from BLM-GNF to BOWERS*.[76] Notwithstanding the failure of the previous suit to establish any liability on Bowers's part, Bowers has plausibly argued that the DOJ may seek to revive this accusation, which certainly bears a nexus to Bowers's director and officer status.

### ii. Form 990

The clearest nexus between Bowers's director and officer status and the DOJ's investigation relates to Bowers's signature on BLM-GNF's Form 990 for the years 2020 and 2021. The DOJ stated in its subpoena that it was investigating potential

---

[76] *See* Cree Aff., Ex. K (enclosing the complaint in *Black Lives Matter Grassroots, Inc. v. Black Lives Matter Glob. Network Found., Inc.*, No. 22STCV28481 (Cal. Super. Ct., Los Angeles Cnty. Sep. 1, 2022)).

violations of 18 U.S.C. § 1519, the statute criminalizing the knowing destruction, alteration, falsification, or concealment of records to impede a federal investigation.

In its briefing, BLM-GNF suggests that the DOJ cannot be investigating Bowers as *signatory* of the 2020 Form 990, because the DOJ is investigating false information contained in the 2020 and 2021 Form 990s, and the DOJ does not appear to be investigating the signatory of the 2021 Form, Board Chair Cicley Gay.[77] Therefore, under BLM-GNF's theory, the DOJ must be focused on Bowers's supply of "false information to BLM GNF," which was reported on that form and supplied by Bowers.[78]

Furthermore, BLM-GNF argues, Bowers assumed his role as Deputy Executive Director "for precisely one reason," namely signing documents on BLM-GNF's behalf.[79] Consequently, Bowers is not entitled to advancement relating to an investigation focused on anything other than signing the documents.

Notably, at oral argument, BLM-GNF retreated from this argument. BLM-GNF conceded that, on the Form 990, "He signed that in his role as director. And there might be some sliver for which ultimately BLM-GNF would be responsible

---

[77] DAB, 20.

[78] *See id.*

[79] *Id.* at 21.

25

for his fees on that."[80]  But BLM-GNF still contended that the DOJ focused on the characterizations of certain expenditures on the Form 990, not the signatory itself.

But again, BLM-GNF parses too finely here.  The record is sparse about the DOJ's intentions for its investigation.  The subpoenas indicate (1) the demanded documents and (2) statutes representing possible theories of criminal liability.  Nothing more.  Given that Bowers signed the Form 990 as a director of BLM-GNF, and the DOJ is investigating whether Bowers and others broke the law in submitting this tax filing, Bowers has met his burden in proving a nexus between the Investigation and his role as director and officer.

### iii.      Donor Statements

Bowers gives shorter shrift to the argument that the DOJ requested copies of statements to donors, which Bowers had prepared in his role as director and Secretary.  BLM-GNF contradicts this contention by arguing that Bowers could only have conducted such duties under the Services Agreement with BOWERS*, not as a director or officer.

The reality is ambiguous.  Under the Services Agreement, BOWERS* contracted to act as BLM-GNF's "communications agency of record,"[81] with

---

[80] Tr. 47:06–09.

[81] Lam Aff., Ex. C.

responsibilities over "communications," "message development," and "campaign management."[82] The Bylaws lay out the Secretary's responsibilities:

> The Secretary shall: (a) keep the minutes of meetings of the Board and any minutes which may be maintained by committees of the Board; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (c) be custodian of the corporate records of the corporation; (d) sign with the Executive Director, or other officer authorized by the Executive Director or the Board, deeds, mortgages, bonds, contracts, or other instruments; and (e) in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to them by the President or the Board."[83]

The Bylaws do not provide explicit authorization for the Secretary to communicate with donors. Certainly, the Services Agreement empowered BOWERS* to consult on core messaging and branding, engage in digital fundraising, and help with policy and advocacy campaigns, of which donor communications could play a part.[84] But the Secretary's role bears some involvement. For one, subpart (c) contemplates that the Secretary acts as custodian over corporate records, which certainly includes donor statements. Second, subpart (e) comprises a catch-all category, such as incidental duties to the Secretary's explicit responsibilities, which does not foreclose that the Secretary could *communicate* with donors about records *organized* under

---

[82] Cree Aff., Ex. E (2020 Consulting Agreement).

[83] Compl., Ex. 1, § 4.5 (BLM-GNF Bylaws).

[84] Cree Aff., Ex. N (July 2023 Services Agreement).

the Secretary's explicit duties. To weave an even more tangled web, Bowers admits that, in his role as Secretary, he used "BOWERS* consulting firm systems that he controlled as he saw fit."[85] No clear line of demarcation separated (1) Bowers *qua* Bowers and (2) Bowers *qua* BOWERS*. Nor does BLM-GNF appear to have objected to this organizational intermixing, at least until Bowers asserted his right to advancement under the Bylaws. Whether by intention or happenstance, BLM-GNF blended Bowers' and BOWERS*' roles, functions, and compensation into a near-unrecognizable morass.

In light of the opaque and *ad hoc* internal workings of BLM-GNF, including its liberal use of consultants and casual allocation of duties, BLM-GNF cannot unambiguously demonstrate that the donor communications have no nexus to Bowers's role as a director and officer of the corporation. *See Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 407 (Del. Ch. 2009) ("[T]he claim for which the corporation seeks to avoid advancement must *clearly* involve a specific and limited contractual obligation *without any nexus* or casual connection to official duties.").

### iv. Timeline Overlap

The final indicia that the DOJ Investigation bears a nexus or causal connection to Bowers's director and officer position relates to the relevant time period for the

---

[85] DOB, 12.

DOJ's investigation. While probative, this argument is not dispositive. The subpoenas request documents spanning from January 2020 to 2025, when the subpoenas were issued. Notably, Bowers assumed his role as Deputy Executive Director in July 2020. Furthermore, 18 U.S.C. § 3282 imposes a five-year statute of limitations for federal criminal charges, which further limits the scope of the Investigation to a time period during which Bowers served as director and officer. But for the purposes of advancement entitlement, the DOJ subpoenas generally trigger the rights since a portion of the timeframe is a covered period. The DOJ's ultimate focus and intentions are not yet cemented. Whether final allocation is for Bowers' pre-director conduct will be determined in the *Fitracks* process and at the indemnification stage.

Bowers will need to heed this Court's teaching on the *Fitracks* process. The subpoenas do request information relating to 2020, predating Bowers's service as a director and officer of BLM-GNF. To the extent Bowers seeks advancement for expenses incurred relating to these requests, he cannot prevail without affirmatively demonstrating that he is subject to investigation for subsequent actions that relate to his pre-service time period.

Nevertheless, Bowers's timeline argument provides one tile to the greater argumentative mosaic. Considering (1) the DOJ's embezzlement investigation, (2) Bowers's signature on the Form 990, (3) Bowers's ambiguous role in overseeing

29

donor communications, and (4) the time period the DOJ is investigating, Bowers has met his burden of proof in demonstrating entitlement to advancement.

### c. Bowers's expenses were reasonably incurred.

The parties have not disputed whether Bowers reasonably incurred expenses. I discuss the question of apportionment below.

### B. Bowers is entitled to advancement as an agent in his individual capacity, but not for expenses solely incurred for his work through BOWERS*.

BLM-GNF raised a series of clever arguments why Bowers is not entitled to advancement. Namely, that Bowers is not entitled to advancement as BLM-GNF's agent even though the Bylaws contemplate indemnification and advancement rights for agents. And while I have held that Bowers is entitled to advancement for expenses related to his role as director and officer of BLM-GNF, the scope of his advancement rights as agent will likely bear on the fees he is entitled to receive.

### 1. The Services Agreements did not supersede or alter Bowers's indemnification rights under the Bylaws.

BLM-GNF contends that the Services Agreements executed between BOWERS* and BLM-GNF supersedes Bowers's entitlement to advancement under the bylaws because the Services Agreements provide no right to advancement, only indemnification.

Because "[c]orporate charters and bylaws are contracts among a corporation's shareholders . . . [t]he rules that govern the interpretation of statutes, contracts, and

30

other written instruments apply to the interpretation of corporate charters and bylaws." *Strougo v. Hollander*, 111 A.3d 590. 597 (Del. Ch. 2015) (internal citations omitted). Even where bylaws guarantee certain rights or privileges, parties are free to contractually amend, alter, or limit such rights. *See, e.g.*, *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 173 (Del. Ch. 2003) ("courts should be reluctant to interpret § 145 and bylaws that implement it as displacing the more specific contractual arrangements that are typically drafted between corporations and outside contractors, such as attorneys, investment bankers, engineers, and information technology providers."). As the oft-quoted maxim of contractual interpretation advises: "the court prefer[s] specific [contractual] provisions over more general ones." *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 254 (Del. 2017).

Delaware circumscribes an agent's advancement rights under 8 *Del. C.* § 145. *Fasciana* held that Section 145 used the term "agent" in "the more precise sense characteristic of its primary common law definition." 829 A.2d at 169. One defining hallmark of agents is their "power to act on behalf of the principal with third persons." *Id.* (quoting *Borders v. Townsend Assocs.*, 2002 WL 725266, at *5 (Del. Super. Apr. 17, 2002)). In contradistinction to public policy buttressing advancement rights for directors and officers, for whom advancement accords protection in order to "make socially useful decisions that involve economic risk,"

public policy counsels a more limited advancement protection for agents. *See id.* at 170. So, an agent is entitled to advancement only where Delaware would recognize an agent's legitimate exercise of proper authority. *See id.* at 163.

In 2020 and 2023, BLM-GNF and BOWERS* executing Consulting Agreements. These agreements both define the role of BOWERS* as agent, and provide an indemnification, but not advancement, right.[86] Under the Services Agreements, BOWERS* is entitled to indemnification only for claims "arising from or in connection with [BLM-GNF's] approval of all press and/or promotional activities."

So far, so good. But BLM-GNF proceeds to argue that the Services Agreements modified Bowers's advancement rights as an agent, and the Services Agreements alone should define this right.[87] This is a step too far.

First, Bowers served as BLM-GNF's agent before signing the Services Agreement and is entitled to advancement as an agent to the extent he reasonably incurred legal expenses by reason of the fact of his agency status. For example, Cullors appointed Bowers as Deputy Executive Director in 2020, vesting him with authority to (1) sign legal documents, (2) negotiate with fiscal sponsors, and (3)

---

[86] *See* Lam Aff., Ex. A, §§ 7, 11.
[87] DOB, 14.

32

manage fund housing donations.[88] I need not parse whether each of these responsibilities arose by reason of Bowers's officer or agent status, because to the extent it was the latter, he appeared to have authority for such responsibilities and is consequently indemnified and entitled to advancement.

Second, the Services Agreements were executed between BLM-GNF and BOWERS*, not Bowers. The Services Agreements recognized the separate relationship between BLM-GNF and Bowers: "In addition to the above, the parites [sic] hereby agree that Shalomyah Bowers is also an employee of Black Lives Matter Global Foundation per a separate agreement."[89] While the Services Agreements appear to have contractually limited BOWERS*'s entitlement to advancement, they did not do so for Bowers. Therefore, where Bowers functioned as BLM-GNF's agent beyond the scope of the BOWERS* Services Agreements, he is entitled to advancement and indemnification under the Bylaws.[90]

---

[88] *See* Cree Aff., Ex. C (stating that following Cullors's resignation, Fund Manager responsibilities "fell even more heavily on Shalomyah Bowers as a *de facto* Fund Manager"); *see also id.* at Ex. A at ¶¶ 35–38, 41, 49, 51, 85 (describing, *inter alia*, Bowers's appointment to Deputy Executive Director and subsequent assumption to "the role of the Tides point of contact for all BLM GNF funds held at Tides").

[89] Cree Aff., Ex. E, § 8 (2020 Consulting Services Agreement).

[90] As BLM-GNF often referenced, the Services Agreements created an agency relationship with BOWERS* limited to specific responsibilities. *See id.* at § 1 (describing Consulting Services). Furthermore, BLM-GNF has deftly argued that BOWERS* may not have even been subject to the Bylaws's advancement right because the Bylaws only contemplate

## 2. The Investigation into alleged fraud and embezzlement do not preempt the availability of advancement for Bowers in his capacity as an agent.

BLM-GNF next argues that Bowers cannot be entitled to advancement as an agent for the DOJ's investigation into potential embezzlement and fraud. BLM-GNF reads *Fasciana* to permit advancement to agents only for actions for which the agent possessed actual authority. Because BLM-GNF never authorized Bowers to commit fraud and embezzlement, it contends these actions necessarily exceeded his authority as agent and advancement must be denied.

This theory of the case suffers from two fatal flaws. First, it seeks to import our law on an agent's fiduciary duties into the distinct regime of advancement rights. Second, it assumes Bowers is guilty of misconduct, long before any tribunal has authored such a determination.

BLM-GNF relies on principles of an agent's fiduciary duty to the principal to interpret *Fasciana*'s limit on Section 145 advancement for agents. Certainly, *Fasciana* recognized that Section 145 indemnifies and provides advancement only

---

indemnification and advancement for natural persons, not entities. *See* Compl., Ex. 1, § 7.1(a) ("The Corporation shall indemnify each director, officer, employee and agent of the Corporation who is a *natural person* . . . .") (emphasis added). Therefore, Bowers is entitled to advancement for any expenses reasonably incurred with a nexus to (1) his work as an agent in his *individual* capacity and (2) his work as a director and officer for BLM-GNF. Where Bowers incurred fees solely related to his work with BOWERS*, he is not entitled to advancement. Bowers's counsel shall, in good faith, reasonably apportion fees to reflect this distinction. *See infra* at Section II.C.

for agents in the common law sense of the term. 829 A.2d at 170. But *Fasciana* held that a corporation's outside counsel was not entitled to advancement for expenses related to his fraud indictment. *See id.* at 168 ("Fasciana primarily argues that because he is alleged to have committed misconduct in his capacity as an attorney for [the entity], he must necessarily face liability as an agent of EDS because an attorney *is always* an agent for his client."). *Fasciana* rejected this argument for the limited definition of agent: "§ 145 embraces the core common law definition of an agent, which requires that the agent be authorized to act on behalf of the principal as to third parties." *Id.*

BLM-GNF stakes its position on this core phrase—"that the agent be authorized to act"—and reads it to mean "actual authority." In support, BLM-GNF contends that "[a]n agent has a duty to take action only within the scope of the agent's actual authority."[91] But for this proposition BLM-GNF reaches into our jurisprudence addressing breaches of fiduciary duty in the alternative entity context. *See JER Hudson GP XXI LLC v. DLE Inv'rs, LP*, 285 A.3d 755, 787 (Del. Ch. 2022) ("The partnership's purpose limits the general partner's authority and therefore circumscribes its fiduciary duties. An agent has a duty to take action only within the scope of the agent's actual authority.") (internal citations omitted). Tellingly, BLM-

---

[91] DOB, 15.

35

GNF cites the Restatement's entry regarding the "General Fiduciary Principle" for agents. *See* RESTATEMENT (THIRD) OF AGENCY § 8.01 cmt. b (AM. L. INST. 2006) ("Unless the principal consents, the general fiduciary principle . . . also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.").

Black-letter agency law instructs us that actual authority is not the sole means of giving an agent authority to act. Apparent authority too plays a role. "Apparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." RESTATEMENT (THIRD) OF AGENCY § 3.03 (AM. L. INST. 2006). Therefore, as a matter of first principles, BLM-GNF proffers too narrow a gloss on the requirement that "the agent be authorized to act."

Second, BLM-GNF prejudges Bowers. BLM-GNF reasonably notes that it never authorized Bowers to "defraud it or embezzle from it."[92] Therefore, it suggests, Bowers's behavior "is not and could not be within the scope of . . . [the] agency relationship with BLM GNF."[93] But I cannot assume at this stage that just

---

[92] DOB, 16.

[93] *Id.* at 16–17.

because the DOJ is investigating fraud and embezzlement that the investigation has no nexus with Bowers's agency role. After all, what if Bowers did not embezzle or defraud? What if the DOJ is investigating trumped up allegations that bear on Bowers's responsibilities as agent but constitute no wrongdoing?

Thankfully, our caselaw prevents such prejudgment. "[T]his court has often been required to uphold the indemnification and advancement rights of corporate officials accused of serious misconduct, because to do otherwise would undermine the salutory public policies served by § 145." *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *6 (Del. Ch. June 18, 2002). Rather than prejudging Bowers, BLM-GNF has every right to advance the funds and later seek recoupment in indemnification. *See Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *6 (Del. Ch. May 28, 2015).

## C. BLM-GNF must advance all reasonably incurred expenses.

The parties dispute apportionment of fees. Bowers contends that BLM-GNF should advance all reasonable incurred fees because, in this "confidential pre-charging criminal investigation," it is impossible to determine the relationship between any theory of criminal liability and any requested document.[94] BLM-GNF counters that the DOJ is investigating other of Bowers's clients than just BLM-GNF,

---

[94] POB, 23.

that Bowers undertook actions both in his personal capacity and through BOWERS*, and the DOJ has an "exceedingly narrow focus" on Bowers's non-BOWERS* roles.[95]

In *Krauss*, this Court faced a similar challenge. *Krauss v. Life Sciences Corp.*, 2022 WL 665323, at *5 (Del. Ch. Mar. 7, 2022). The SEC issued four subpoenas, of which only one as advanceable. The Court adopted the advancee's position: that advancee's counsel "make good faith effort to allocate expenses between those incurred by [advancee] and those incurred by [other entities], with any expenses benefitting both [advancee] and any other party to the proceeding . . . including [as] if they would have been incurred on behalf of [advancee]." *Id.*

Seeing the propriety of this approach, I adopt the same. Bowers's counsel must make a good faith effort to properly allocate expenses. BLM-GNF must advance any expenses that cannot reasonably be apportioned, with an opportunity to seek recoupment at indemnification.

### D. Bowers is entitled to fees-on-fees.

Fees on fees are "an inherent right of the party materially successful in asserting a claim for indemnification or advancement." *Weaver v. ZeniMax Media, Inc.*, 2004 WL 243163, at *7 (Del. Ch. Jan. 30, 2004). If a corporation wishes to

---

[95] DAB, 22.

avoid the obligation to pay fees on fees, "it must expressly preclude any such right." *Centrella v. Avantor, Inc.*, 2024 WL 3249274, at \*18 (Del. Ch. July 1, 2024), *aff'd* 341 A.3d 505 (Del. 2025). Our law is concerned with the actual success achieved, not "with which theory a party prevails on when it comes to apportioning fees on fees for varying levels of success." *Id.* at \*19.

Bowers has prevailed in obtaining entitlement to advancement, both in his capacity as director and officer and as agent. Accordingly, Bowers is entitled to a full award of fees and expenses incurred in bringing this action.

## III. CONCLUSION

For the foregoing reasons, Bowers prevails in full on his claims for advancement and fees on fees. The parties shall follow the procedures set out in *Danenberg v. Fitracks, Inc.*, 58 A.3d 991 (Del. Ch. 2012). The parties shall promptly confer on a form of order implementing this decision and include procedures consistent with *Fitracks*.

39